### In re WATERS.

### BANKERS MORTGAGE BUILDING & LOAN ASS'N v. SIMPSON.

### No. 8462.

Circuit Court of Appeals, Fifth Circuit.

Dec. 20, 1937.

A. Leo Oberdorfer, of Birmingham, Ala., for appellant.

William S. Pritchard, of Birmingham, Ala., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

On an involuntary petition filed June 11, 1930, Norman H. Waters was adjudged a bankrupt on June 18, and a trustee was later appointed. On September 12, 1932, the appellant, Bankers Mortgage Building

& Loan Association, applied to the referee for leave to foreclose a mortgage for a balance of $8,473, which it held on certain lands in the possession of the trustee, by exercising the power of sale contained in the exhibited mortgage. The matter stood until January 28, 1936, when the trustee filed an answer denying that anything was due on the mortgage, together with what he called a cross-bill. The latter set up that on February 17, 1930, a fire had destroyed part of the improvements on the mortgaged land; that Alma Lois Waters, the bankrupt's wife, in whom the legal title to the land then was, had in her name insurance to the amount of $27,500; that the Building & Loan Association had settled the loss for $18,600 and credited the money on the mortgage, all without the consent of the bankrupt or his wife or the bankrupt's creditors, knowing that a bankruptcy proceeding was about to be filed and that the creditors of Waters claimed that the property had been transferred by Waters to his wife with intent to defraud them; that on March 25, 1932, a judgment had been rendered against Mrs. Waters divesting the title out of her and into the trustee; that the insurance claim was worth $27,500 and more than enough to have paid the mortgage, and the Building & Loan Association by releasing it for less was estopped to assert any further claim; and the prayer was for a cancellation of the mortgage and a quieting of the title in the trustee. The Building & Loan Association moved to dismiss the cross-bill for want of jurisdiction in the referee, and, being overruled, answered that Mrs. Waters had disagreed with the insurance company as to the amount of the loss, and pursuant to the policy provision had submitted the question to appraisers, who awarded $18,966.74, which the Building & Loan Association under the mortgage clause in the policies had claimed and collected on proofs made by it therefor and had applied the sum as a credit on the mortgage, leaving a balance of over $6,000 principal, besides interest. On a trial the referee found the award void, and that the mortgage was paid, and decreed it to be canceled. On a review of the referee's ruling the District Court approved it and made another decree to the same effect. The Building & Loan Association appeals.

Appellant still insists that the cross-bill praying a cancellation was a matter for a plenary suit and is not within the summary jurisdiction of the referee. Appellee, contending that the summary jurisdiction extends to ascertaining what liens are on property in the trustee's possession, moves to strike the narrative statement of the evidence and the assignments of error raising questions of fact because the concurrent findings of referee and judge cut off inquiry into such questions. We think that the referee went too far in attempting to decree a cancellation of the mortgage summarily; but, since the evidence was all reported stenographically and went up to the judge along with the documentary proof and was fully considered by the judge, who made his own decree, the case has had just the treatment it would have had if a plenary bill had been filed, been reported on by a master, and then considered by the court. The referee made full findings of fact and conclusions of law, as a master would do, and the appellant elaborately excepted to them as if to a master's report. We will treat the case as a controversy arising in bankruptcy by intervention and decided by the judge, review of which on appeal as in equity opens up questions of law and fact.

The narrative of the evidence duly approved by the judge will be considered. The assignments of error are prolix and overnumerous, but we understand what questions they seek to raise. Some of the findings of fact are asserted to be without evidence to support them, or contrary to all the evidence, and we must examine them notwithstanding the presumption of correctness that attends concurrent fact findings by master and judge.

There is no dispute that the bankrupt owned the land, more than a hundred acres, and in the early part of 1928 conveyed it to his wife. An old house upon it was afterwards repaired and enlarged at a cost of over $30,000 to make a handsome home in which they lived. Part of the money to make the improvements was obtained in February, 1929, on the mortgage in controversy for $25,000 made to the Building & Loan Association by Mrs. Waters as "borrowing stockholder" but joined in by Waters as husband. As a part of the loan transaction, the insurance in controversy was required to be taken out, each policy having attached to it a mortgage clause in favor of the Building & Loan Association and making the loss payable to it as its interest might appear.

The policies were in the name of Mrs. Waters, and presumably paid for by

her. She signed the proofs of loss, though her husband assisted her in the adjustment, and she signed the agreement for the appraisal, naming one McCauley as her appraiser. She was in possession of the property and the holder of the legal title at the time of the mortgage, at the time of the fire and until the decree rendered in March, 1932, which did not purport to cancel her deeds but divested her of title and vested it in the trustee. That decree makes no fact findings, and has the appearance of being a compromise, as Mrs. Waters was awarded $6,000, and it followed immediately a dismissal from the case of the Building & Loan Association and the insurance companies who had been impleaded to try the very matter now being litigated. The bill had averred that Waters conveyed to his wife "for the purpose of hindering, delaying and defrauding his creditors and/or as a voluntary conveyance." There was no allegation that Mrs. Waters had conspired with him. There is no evidence in the present case to show that the conveyance to her was other than a gift from husband to wife, void as to creditors because it left him insolvent. As against him the conveyance was good, although his creditors might seek to set it aside. She became owner subject to their attack. She had an insurable interest. Insurance taken by her payable to herself was hers. The creditors had no interest in the insurance. Because the property burned, the creditors do not acquire any right to her insurance. An early case so holding is Lerow v. Wilmarth, 9 Allen, Mass., 382. Shadgett v. Phillips & Crew Co., 131 Ala. 478, 31 So. 20, 56 L. R.A 461, 90 Am.St.Rep. 95, asserts a like principle. Forrester v. Gill, 11 Colo.App. 410, 53 P. 230, involved circumstances essentially like the case at bar. The lower court refused even to hear the evidence that the conveyance by husband to wife was to defraud creditors, and that the husband had taken out the insurance in her name and himself paid the premium. The judgment was affirmed. In McLean v. Hess, 106 Ind. 555, 7 N.E. 567, 568, the court pithily said: "The insurance was taken in appellant's name. However fraudulent the purpose may have been in having the property conveyed to her, that policy belonged to her. However fraudulent the conveyance may have been, she had an insurable interest in the property. The insurance was taken in her name. The policy was hers, and the proceeds thereof cannot be taken from her by the husband's creditors."

It follows that, even if devious means and untrue statements were used to get the insurance money, after the bankruptcy proceeding was filed, into the hands of the Building & Loan Association and to keep it out of the bankruptcy court, as the referee found, no wrong was done the trustee. He had no right to the money. True, he represented both the bankrupt and the creditors, but neither had any right to the insurance money. The entire transaction was valid as against the bankrupt, and the only right of the creditors was to get the land itself for subjection to their debts. That the trustee has accomplished by the decree of March 25, 1932, having then relaxed his effort to pursue the insurance.

It follows, too, that if Mrs. Waters, the owner of the insurance, has been injured by any failure on the part of the Building & Loan Association to collect all that should have been collected, the right to complain is in her. It is only because the mortgage is confessedly good against his land for any balance due, and that an offset of the claim of Mrs. Waters against the Building & Loan Association might reduce that balance, that the trustee could have any standing to complain. Assuming that he can assert her right and without making her a party, he shows no wrong done her. The Building & Loan Association collected and credited all that she was entitled to. The policies each contained a provision that in the event of disagreement as to the amount of the loss it was to be ascertained by two competent and disinterested appraisers, one each selected by insurer and insured, who themselves should select a competent and disinterested umpire, that the appraisers should estimate and appraise the loss, stating separately the sound value and damage and, failing to agree, should submit their differences to the umpire and that the award in writing of any two should determine the amount of the loss. Mrs. Waters in person, along with the representative of the insurers, signed a written nomination of appraisers under this provision. The appraisers on May 10, 1930, took a proper written oath and selected an umpire who also took a proper oath. On May 22d a written award in due form was signed by one appraiser and the umpire, fixing the sound value at $25,288.93 and the damage at $23,797.93. There was a three-quarter value clause in each policy, which made collectible $18,966.74, the amount proved for and collected by the Building & Loan Association, expressly in

pursuance of the award. We have carefully read the evidence relating to the appraisal, and see nothing to impeach it. Each of the appraisers was an experienced and competent contractor and builder, and had several times been in the house before it burned. The umpire also was an experienced builder, but had not been in the house. The appraisers were furnished by the insured with the floor plans, which they compared with the ruins, photographs of the house, and bills and invoices for the materials used in it. They also interviewed the contractor who built it, and made careful inquiries of dealers as to present prices of material, the great depression having already begun. No information or evidence was refused, although some was not believed. The appraisers disagreed both as to how much material really went into the house (another similar house being under construction by the contractor and Waters at the same time nearby), and as to the proper prices to be allowed, and submitted their differences along with the information and the papers they had to the umpire. He inspected the premises and checked the materials against the plans and specifications, and, being unable to reconcile the views of the appraisers, he took the plans and specifications and made an estimate in great detail for the replacement of the house. This estimate amounting to $25,288.93, he submitted to the appraisers and said he would give bond to rebuild the house for that sum. He and one appraiser then agreed on that as the sound value at the time of the fire, and an agreed amount was deducted for salvage, leaving a loss of $23,797.93. McCauley, the appraiser nominated by Mrs. Waters, concedes the competency and honesty of his associates, and tells of their earnest efforts to arrive at the truth and his differing with them only in judgment of quantities and values. He says that, when the differences were pointed out to him between the invoices furnished by Waters and the requirements of the plans and specifications, "I realized they had me whipped. The bases used by Mr. Wheelock and Mr. Haley," (the other appraiser and the umpire), "are used by a number of contractors and architects—by as large a number as the cubic foot basis that I employ * * * I told Mr. Haley that I could not put it back for that amount of money. He said he would give a written statement and bond that he could put it back. That was when I admitted that I was whipped in the case. I don't know whether I advised Mr. and Mrs. Waters that the offer had been made to replace the property on the basis of their award and that a bond would be made, but they knew it." The diligence of the appraisers and the honesty of the award are beyond question.

This was not a true arbitration in which a formal hearing was due, but was rather an appraisement of two subject matters, of a building as sound and of the salvage left, by persons selected as experts, two of whom were acquainted with the building in its sound state and all of whom had photographs of its exterior and the floor plans and specifications by which it was built. They could and did see the salvage for themselves. There was no need to swear witnesses or the like. Their expert judgment was what was expected and what was given. The insured knew of the proceedings and furnished all the information she wished to. The result ought to stand. Phoenix Ins. Co. v. Everfresh Food Co., 8 Cir., 294 F. 51; American Steel Co. v. Fire Ins. Co., 3 Cir., 187 F. 730; Glens Falls Ins. Co. v. Garner, 229 Ala. 39, 155 So. 533. This award was not incomplete or absurd on its face as in Continental Ins. Co. v. Garrett, 6 Cir., 125 F. 589, and Aetna Ins. Co. v. Murray, 10 Cir., 66 F. 2d 289. The appraisers did not refuse information from the insured or omit important items of value as in Aetna Ins. Co. v. Hefferlin, 9 Cir., 260 F. 695, and St. Paul Fire & Marine Ins. Co. v. Tire Clearing House, 8 Cir., 58 F.2d 610. No attempt to make a compromise acceptable to the parties instead of an appraisement according to their judgment is presented, as in St. Paul Fire & Marine Ins. Co. v. Eldracher, 8 Cir., 33 F.2d 675. All these cases recognized the rule which we apply that every reasonable intendment and presumption is in favor of an award of appraisers selected to determine the value of property lost, and it will not be vacated unless it clearly appears that it was made without authority or was the result of fraud, or mistake or misfeasance of the appraisers. That the court may think it should have been for more or less is not enough. The referee's finding that this award was not binding is, in our judgment, without evidence to support it.

No issue was tendered in the pleadings about usury, but the referee took evidence touching the corporate organization of appellant, and found that it was not a true building and loan association and not en-

titled to operate as one, with the result that usury should be held to have been charged so that all interest was forfeited and the balance due on the mortgage was less than $3,000. The judge made no decree on that matter. It has been argued here only by appellant. We do not decide it. If the issue is desired to be raised by an amendment of the pleadings, we will not cut off the inquiry. The judgment is accordingly reversed, with direction to recognize the mortgage of appellant without further offset or credit because of the insurance on the house, but subject to such inquiry as may be properly made touching interest on the mortgage debt.

Judgment reversed.