**Frank E. WETZEL, Plaintiff–Appellee,**

v.

**Ralph EDWARDS, etc. et al.,
Defendants–Appellants.**

No. 79–6801.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1980.

Decided Oct. 27, 1980.

Rufus L. Edmisten, Atty. Gen. of North Carolina and James Peeler Smith, Asst. Atty. Gen., Raleigh, N. C., for defendants–appellants.

Donna H. LeFebvre and Hanan M. Isaacs, North Carolina Prisoner Legal Services, Inc., Durham, N. C., for plaintiff–appellee.

Before BRYAN and PHILLIPS, Circuit Judges, and WALTER E. HOFFMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

WALTER E. HOFFMAN, Senior District Judge:

Appellee, Frank Wetzel, a state court prisoner brought this action under 42 U.S.C. § 1983 alleging violation of his Eighth and Fourteenth Amendment rights. Specifically, appellee contends that the named defendants have violated his due process and equal protection rights by failing to transfer him to a facility commensurate with his medium custody classification. Additionally, he argued that appellants' conduct constituted cruel and unusual punishment. Appellee sought actual and punitive damages, declaratory relief, and preliminary and permanent injunctions requiring the defendants to transfer him to a medium custody unit.

Appellants moved under Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the action for failure to allege grounds which would entitle Wetzel to the relief sought. In addition, appellants filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. These motions were accompanied by memoranda of law and supporting affidavits.

The district court issued an order on January 25, 1979 requiring appellants to respond to specific inquiries concerning the housing and treatment of appellee and similarly situated inmates. The parties responded with voluminous affidavits.

The district court found that appellants' conduct may have contravened Wetzel's Fourteenth Amendment due process rights by effectively precluding him from meaningful parole consideration. Wetzel's Eighth Amendment claims were dismissed, the court noting that the appellants' conduct does not shock the conscience of society under any standard derived from the Eighth Amendment. Instead, the court recognized that the appellants have real questions concerning the manner in which Wetzel should be treated.

The lower court judge issued an opinion and order on July 26, 1979, denying appellants' motions to dismiss and for summary judgment. The court granted Wetzel's motion for a preliminary injunction ordering that he be transferred to a medium custody facility where he should be permitted to participate in such rehabilitative programs as might be available at such facility.

Appellants moved for reconsideration under Rule 60, F.R.Civ.P., and for a stay of execution pending action on such motion. Affidavits and briefs were submitted by both sides to this controversy. Eventually, the district court judge held a conference in chambers to discuss the matter. Thereupon, the court denied the appellants' motion to reconsider, however, the court acknowl-

edged the closeness of the issues and indicated that it would consider a motion for a stay pending appeal. Thereafter, appellants sought and were granted, a stay of execution pending appeal to this court. The appellants appeal the order of the district court granting the preliminary injunction.

In 1951, Wetzel, at that time 36 years of age, escaped from a mental institution in New York where he was being held for observation pending trial. He stole an automobile and firearm and was destined for Mississippi to see his brother who was awaiting execution. Enroute Wetzel murdered two North Carolina Highway Patrolmen in separate incidents in two counties on the same night.

Wetzel fled to California where he was later apprehended and returned to North Carolina. Thereupon, he was convicted of first degree murder in separate trials and sentenced to consecutive terms of life imprisonment. Wetzel was housed at Central Prison, the only maximum security facility in North Carolina. Two years after he entered the prison system, he was implicated in an escape plot and his fingerprints were found on a pistol retrieved from the confines of Central Prison. Wetzel was transferred briefly to another prison, where apparently he was involved in another unsuccessful escape plot. Soon thereafter, he was returned to Central Prison.

Wetzel's record has been exemplary for at least the past ten years. North Carolina prison officials uniformly assert that during recent years Wetzel has been a model prisoner. He has participated in all educational and rehabilitative programs at Central Prison. Additionally, he is active in church affairs, Alcoholics Anonymous and the Jaycees.

The North Carolina Department of Corrections has separated the prison units and prisoners into four security grades: (1) minimum custody, or honor grade; (2) medium custody; (3) close grade; and (4) maximum custody. There are 48 units classified as minimum custody, 26 units classified as medium custody, 2 units classified as close custody, and only 1 unit, Central Prison, is classified as maximum custody.

The custody classification of the unit is determinative of the available programs, rehabilitative opportunities, degree of personal freedom accorded inmates, as well as the nature and degree of security precautions taken by penal administrators. In general, it has been the practice of the Department of Corrections to assign prisoners to prison units commensurate with the custody status assigned to individual inmates.

The Central Classification Board (hereinafter CCB) represents the Division of Prisons as the states' inmate classification authority. The CCB changed Wetzel's status from maximum to close custody in 1973 and recommended his transfer to Caledonia, then a close custody unit. Appellant Edwards, the Director of Prisons, refused to allow the transfer. The CCB again recommended transfer to Caledonia in March, 1974, and this transfer was denied.

Wetzel was promoted to medium custody in August of 1974, however, he was retained at Central Prison. The Institutional Classification Committee (hereinafter ICC) recommended Wetzel's transfer to a medium custody facility. Edwards and appellant Kautzky, the Deputy Director of Prisons, refused to act on the suggestion. The ICC has reiterated its position recommending that Wetzel be transferred.

It is the responsibility of the ICC to consider Wetzel for minimum custody status. Since August of 1975, the ICC has reviewed Wetzel for minimum custody every six months. The ICC has failed to recommend such a change in custody classification expressly because Wetzel has not spent time in a medium custody facility.

Wetzel filed a grievance with the Inmate Grievance Commission (hereinafter IGC) in 1977 which ruled, after a hearing, that he had been treated unequally. It recommended to appellant Reed, Secretary of the Department of Correction, that Wetzel be given the same consideration for transfer as similarly situated inmates who have been

classified as medium custody by the CCB. In fact, Wetzel is the only medium custody inmate permanently housed at Central Prison. Nonetheless, the IGC's recommendation has been ignored by the Department of Corrections. Wetzel has retained his medium custody status over the past six years without incurring adverse sanctions due to infraction of prison rules, yet he has not been transferred to a medium custody facility.

The essence of Wetzel's case is that, although he has been classified as a medium custody prisoner by the classification authorities of the Division of Prisons, appellants have refused to transfer him from Central Prison, North Carolina's only maximum custody institution, to a medium custody facility, in spite of the fact that Wetzel is deemed to be a model prisoner by the prison authorities. Wetzel alleges he has been denied the opportunities available at medium custody units, such as rehabilitative programs and the ability to achieve minimum custody and honor grade status. Moreover, he contends that honor grade and minimum custody are prerequisites to meaningful parole considerations.

The appellants emphasize the availability of the mutual agreement parole plan (hereinafter MAP). This is an agreement between the inmate, the Division of Prisons and the Parole Commission under which the Commission sets a certain date for release and the Division agrees to allow the prisoner to participate in certain activities. Successful completion of the activities insures release on the specified date. This program is not embodied in the prison regulations but apparently is fully developed. Edwards stated in an affidavit that the Division would give serious consideration to putting Wetzel on the MAP program once the Commission indicates that he is a serious parole candidate. Moreover, Mr. Woodward, chairman of the Commission, stated, based on past experiences, that he felt that the Division would cooperate if and when the Commission requested that Wetzel be transferred to another facility for observation for parole. From this, appellants insist that Wetzel's presence at Central Prison does not hurt his parole chances.

## I.

The ultimate merits of the controversy are not before us on appeal and we do not decide them. This court decides only whether the grant of interlocutory relief to Wetzel was appropriate under the facts of this case.

■ The standard of review on appeal is whether the record shows an abuse of discretion by the district court, not whether the appellate court would have granted or denied the injunction. *Sinclair Refining Co. v. Midland Oil Co.*, 55 F.2d 42, 45 (4th Cir. 1932).

■ Preliminary injunctions are not to be granted automatically. *First Citizens Bank & Trust Co. v. Camp*, 432 F.2d 481, 483 (4th Cir. 1970). Moreover, "[w]here serious issues are before the court, it is a sound idea to maintain the *status quo ante litem....*" *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 194–195 (4th Cir. 1977). *Accord: Singleton v. Anson County Board of Education*, 387 F.2d 349 (4th Cir. 1967); *Sinclair Refining Co. v. Midland Oil Co., supra.*

> "The purpose of the preliminary injunction is to preserve the status quo until the rights of the parties can be fairly and fully investigated and determined by strictly legal proofs and according to the principles of equity. [citations omitted]" *Meiselman v. Paramount Film Distributing Corp.*, 180 F.2d 94, 97 (4th Cir. 1950).

■ The authority of the district court judge to issue a preliminary injunction, especially a mandatory one should be sparingly exercised. Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief. *I.C.C. v. Baltimore & Annapolis R. Co.*, 64 F.R.D. 337 (D.C.Md.1974).

■ Furthermore, a preliminary injunction may not be availed of to secure a piecemeal trial. *Meiselman v. Paramount*

*Film Distributing Corp.*, 180 F.2d 94, 96 (4th Cir. 1950). *Accord: Singleton v. Anson County Board of Education, supra.* Generally, the proper administration of justice necessitates that the appellate court have the case completely before it in rendering a decision thereon.

Our decisions in *Blackwelder Furniture Co. v. Seilig Manufacturing Co., supra*, and *Fort Sumter Tours, Inc., v. Andrus*, 564 F.2d 1119 (4th Cir. 1977) are controlling with respect to the trial court standard for interlocutory relief. Judge Winter in *North Carolina State Ports Authority v. Dart Containerline Co., Ltd.*, 592 F.2d 749 (4th Cir. 1979), aptly summarized the applicable rules of law as developed in this circuit:

> "Summarized, the principles laid down in those cases are that in this circuit the trial court standard for interlocutory relief is the balance of hardship test. Four factors enter into the determination of whether to grant or to withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest. There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of the plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented."

*Id.*, at 750.

With this being the appropriate framework for analysis, we turn to the facts of this appeal.

## A. *Injury to the State of North Carolina*

The North Carolina prison authorities were affirmatively directed by the district court to transfer Wetzel to a medium custody facility. This preliminary injunction was subsequently stayed by the lower court pending appeal.

The Director of the Department of Corrections listed in affidavits submitted to the district court his reasons for denying the Wetzel transfer. The justifications advanced below are as follows:

(1) Wetzel's criminal history prior to his North Carolina convictions,

(2) his cold–blooded killing of the two highway patrolmen in separate incidents on the same night,

(3) his implication in two escape attempts soon after his admission to prison in North Carolina,

(4) the fact that Wetzel was an adult of 36, not an "unruly or undisciplined teenager," at the time of the North Carolina murders,

(5) that Wetzel would be an escape risk in a facility less secure than Central Prison,

(6) that apparent rehabilitative progress may represent an attempt to manipulate prison administrators and obtain favorable parole action, rather than actual repentance and reform,

(7) that the risk that Wetzel is not truly reformed and may still be an escape risk is too great to allow him to be transferred at this time,

(8) the prisoners with consecutive life sentences are especially serious escape risks,

(9) public sensitivity concerning Wetzel's crime is still high,

(10) that Wetzel is a potential ringleader if not balanced off against other powerful inmates, and,

(11) that friction exists between Wetzel and other prisoners.

■ Thus, the prison administrators denied Wetzel's transfer based on their informed discretion as penal administrators. The realities of running a penal institution are complex and unique to the prison environment. Federal courts have traditionally been reluctant to interfere in the problems of prison administration. Indeed, the decisions made by prison administrators in their informed discretion have been accorded "wide–ranging deference" by the federal courts. *Jones v. North Carolina Prisoner's Union*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). Moreover, as long as prison authorities are rationally pursuing a legitimate penological objective, the administrator has the "last word." *Pittman v. Hutto*, 594 F.2d 407, 412 (4th Cir. 1977). Judicial recognition that courts are ill-equipped to deal with problems of prison administrators "... reflects no more than a healthy sense of realism." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

> "It is a rule grounded in necessity and common sense, as well as authority, that the maintenance of discipline in a prison is an executive function with which the judicial branch ordinarily will not interfere."
> *Sewell v. Pegelow*, 291 F.2d 196, 197 (4th Cir. 1961).

Furthermore, federal courts have an additional reason to show deference to the decisions of prison authorities, where a state penal institution is involved. *Procunier v. Martinez, supra.*

The possible injury to the defendant–appellants if the preliminary injunction stands is potentially grave. The informed discretion of these penological experts could be radically limited with respect to inmate transfers specifically and, more importantly, with respect to prison discipline in general. It is impossible for the judiciary to predict the ramifications of placing a potentially disruptive force into a medium custody unit. The emotional climate of a penal institution may be dangerously heightened by the transfer of this individual. Additionally, the prison authorities' affidavits suggest that Wetzel could be a serious escape risk if transferred to a medium custody unit.

## B. Injury to Wetzel

The district court placed much emphasis on the possibility of preclusion from meaningful parole consideration if Wetzel were forced to remain at Central Prison. The court felt that Wetzel was unjustly being denied rehabilitative programs available at medium custody units. The district court felt that Wetzel's harm was irreparable. The important question in this regard is the relative quantum and quality of plaintiff's allegation and proof. *Blackwelder Furniture Co. v. Seilig Manufacturing Co., supra,* at 196.

The lower court failed to properly assess the irreparable harm to the plaintiff, Wetzel, if the preliminary injunction was denied. The denial of transfer, insofar as it bears on possible parole consideration, does not amount to irreparable harm. If the plaintiff were to be victorious upon final hearing, the court is not without the authority to make adjustments which would compensate Wetzel for the improper denial of transfer. In short, while Wetzel raised the possibility of irreparable injury, he fell short of proving the likelihood of any actual irreparable injury.

## C. Wetzel's Probability of Success

### 1. Due Process–Fourteenth Amendment

Wetzel contends that his interest in being transferred is cognizable as a liberty interest for due process purposes and that appellants violated his rights by denying transfer without a hearing. The district court felt that Wetzel raised a substantial question, since it appeared that state statutes, together with appellants' policies and administrative regulations, established a "justifiable expectation" that one's achievement of medium custody status would be accompanied by a transfer to a medium custody facility.

■ The United States Supreme Court has "... repeatedly held that state statutes

may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Vitek v. Jones,* 445 U.S. 480, 482, 100 S.Ct. 1254, 1257, 63 L.Ed.2d 552 (1980). Due process protections must be accorded once a state has granted liberty interests to an inmate ". . . to insure that the state–created right is not arbitrarily abrogated." *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). More specifically, the Court has held prison transfers do not implicate the Due Process clause, unless the state law created a right to stay at a particular institution. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). In a companion case, *Montayne v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), it was held that Due Process did not require a hearing in order to effect a prison transfer "absent some right or justifiable expectation rooted in state law that he would not be transferred except for certain reasons." *Montayne v. Haymes, supra,* at 242, 96 S.Ct. at 2547. However, in these cases transfers were discretionary with prison authorities, and in neither case did the prisoner possess any right or justifiable expectation that he would not be transferred except for misbehavior or upon the occurrence of other specified events.

The State of North Carolina vigorously argues that North Carolina statutes do not establish a right or justifiable expectation of transfer. They note that N.C.G.S. §§ 148–4 and 148–36 provide for inmates to be placed in the custody of the Department of Corrections, which is to designate the place of confinement. Accordingly, these state statutes vest far–reaching discretion in the Department and the administrators thereof.

■ Furthermore, appellants correctly assert that the decision of the district court failed to consider the decision of the North Carolina Court of Appeals in *Goble v. Bounds,* 13 N.C.App. 579, 186 S.E.2d 638 (1972), which was subsequently affirmed by the State Supreme Court in 281 N.C. 307, 188 S.E.2d 347 (1972). *Goble* involved the interpretation of the particular statutes at issue in this appeal. The court held, *inter alia,* that a state prisoner has no legal right to the mitigation of his punishment and that the question as to whether a particular inmate is entitled to honor grade status or parole involves policy decisions which should be made by the Department and the Parole Board, not the courts. The court interpreted these statutes as not creating liberty or property interests in parole or honor grade status. Moreover, it is well–settled that the federal courts are bound by the interpretation placed on state statutes by the highest courts of the state. *Ferguson v. Manning,* 216 F.2d 188 (4th Cir. 1954); *Accord: Paine v. Baker,* 595 F.2d 197 (4th Cir. 1979), *cert. denied* 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979). [specifically upholding decision in *Goble v. Bounds, supra.*]

■ The district court found that the denial of transfer implicated due process because it hindered Wetzel's chances to obtain parole. It is clear that the mere existence of a parole system does not give an inmate a sufficient expectation of release such as to necessitate due process protections which unlike the situation of a parole revocation does require such protection. The extent of protection accorded an inmate in the decision as to whether to grant an inmate parole is dependent upon state law. *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). The state argues that the state statutes, as interpreted by the North Carolina Supreme Court in *Goble v. Bounds, supra,* do not establish a property or liberty interest in one's grade or eligibility for parole. Consequently, appellants assert that *Meachum* dictates that no due process rights are implicated and questions of assignment and custody level should be left to the discretion of prison officials. *Cooper v. Riddle,* 540 F.2d 731 (4th Cir. 1976).

Wetzel, however, emphasizes N.C.G.S. § 148-22 which directs the Department of Corrections to provide for the prisoners' correction and return to the community as soon as practicable; N.C.G.S. § 148–36 au-

thorizing the Department to adopt regulations in order to classify prison facilities and to devise programs designed to facilitate proper treatment of inmates on an individualized basis; and N.C.G.S. § 143B–261 which expressly provides that rehabilitation is a goal of incarceration. Wetzel argues that these state statutes created a right to expect that appellants would assess the individual inmate's needs in order to effectively make an effort to rehabilitate such inmate.

Additionally, Wetzel stresses that N.C.G.S. § 148–36 mandates that prisoners be placed in the "appropriate" facility considering applicable "custodial and correctional goals." He argues that the classification system creates an expectation that he will be housed in an "appropriate facility" and because he is a medium custody prisoner, Central Prison, the state's only maximum security unit, is inappropriate by definition.

■ Furthermore, Wetzel contends the appellants admitted, though unwritten, a policy of automatically transferring prisoners when their respective status was changed, to a facility with a commensurate classification. This, he asserts, was a valid basis for his legitimate expectation of transfer. The question is thus raised as to whether such unwritten regulations and prison policies create a liberty interest in transfer. The resolution of this issue is not readily apparent from the cases cited by the parties. There has been no definitive ruling by the United States Supreme Court and the lower courts are in disagreement as to the proper resolution thereof. Accordingly, it is premature to assert that Wetzel has demonstrated a clear likelihood of success.

### 2. Equal Protection and Substantive Due Process

Wetzel contends that he is being treated in an arbitrary and capricious manner which violates equal protection and substantive due process rights which arise under the Fourteenth Amendment. The basis of this claim is that the prison administrators have followed a general practice in transferring a prisoner to medium facility upon the inmates receipt of a medium custody security classification.

Wetzel appears to argue that we should adopt a strict scrutiny analysis, but fails to identify either the suspect category or the fundamental right involved which would justify such analysis. Even under a rational basis test, he asserts that the prison administrators cannot justify their actions in failing to facilitate his transfer to a medium security unit.

The reasons advanced by the Department of Corrections, supra, p. 287, delineate the motivation behind the decision to retain Wetzel at Central Prison. While we do not reach the ultimate merits of this appeal, it would appear that Wetzel has not demonstrated that such reasons are irrational considering legitimate penological goals of the State of North Carolina. Accordingly, Wetzel has not demonstrated a likelihood of success under the theories of equal protection and substantive due process.

### D. The Public Interest

■ The public interest is a relevant consideration in rendering a decision on whether to issue a preliminary injunction. Adkins v. Scott, 597 F.2d 872 (4th Cir. 1979); Blackwelder Furniture Co. v. Seilig Manufacturing Co., supra. Moreover, it is sometimes concluded that an individual must suffer the risk of possible harm rather than to jeopardize the public welfare. West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232, 236 (4th Cir. 1971).

Personal safety and security is embraced within the amorphous concept of public welfare. The citizens of North Carolina, through their elected representatives, have selected prison administrators whose duty it is, at least indirectly, to protect the members of the community from potentially dangerous inmates. The district court, in its analysis, neglected to give this factor adequate emphasis.

## II.

The decision of a district court to grant or deny interlocutory injunctive relief should be based upon a "flexible interplay" among the factors announced by this Court in *Blackwelder, supra.* These factors are: (1) likelihood of irreparable harm to the plaintiff without an injunction; (2) likelihood of harm to the defendant with an injunction; (3) plaintiff's likelihood of success on the merits and; (4) the public interest.

We believe the lower court improperly balanced the *Blackwelder* factors. In weighing the respective hardship of the parties, the court focused solely on the likelihood of irreparable harm to Wetzel if the preliminary injunction did not issue. "The decision to grant preliminary relief cannot be intelligently made unless the court knows how much the precaution will cost the defendant." *Blackwelder Furniture Co. v. Seilig Manufacturing Co., supra* at 196.

> "The district court's failure to consider what, if any, harm was likely to be caused to ... [the non–moving party] and the issuance of a preliminary injunction without balancing the hardships, as required, when determining whether to grant or deny ... [the moving party's] request for interlocutory injunctive relief, supports our conclusion to vacate the order."

*Maryland Undercoating Co., Inc. v. Payne*, 603 F.2d 477, 482 (4th Cir. 1979).

The district court placed undue emphasis on the likelihood of success factor, also. *Maryland Undercoating Co., Inc. v. Payne, supra*, at 482 n. 13. In its final order which stayed the preliminary injunction, the district court below appropriately acknowledged the closeness of the issue and, as stated in *Maryland Undercoating Co., Inc.*:

> "Even where likelihood of irreparable harm to the plaintiff without an injunction may be characterized as simply 'possible', likelihood of success on the merits is merely one 'strong factor' to be weighed alongside both the likely harm to the defendant if an injunction issues and the public interest." *Id.*, at p. 482, n. 13.

More importantly, the court failed to adequately assess the likelihood of harm to North Carolina prison administrators if the preliminary injunction did issue and the public interest involved. We note that Wetzel has not embarked on frivolous litigation; he has raised substantial issues of constitutional dimensions. These issues should be fully developed at trial in order to insure a proper and just resolution.

VACATED and REMANDED.