**In the Matter of Mark Duane BELTON and Marsha Belton, Debtors.**

**Erlene W. KRIGEL, trustee in bankruptcy, Plaintiff,**

**v.**

**Mark Duane BELTON, Marsha Belton, Lou M. Wood Realtors, Inc., Toney Wayne Brown and Cheri Renee Brown, Defendants.**

**Bankruptcy No. 84–03741–3.**

**Adv. No. 88–0045–3.**

**United States Bankruptcy Court, W.D. Missouri, W.D.**

**April 26, 1988.**

Fred R. Green Stein, Erlene W. Krigel, Krigel & Krigel, P.C., Kansas City, Mo., for Erlene W. Krigel.

John R. Stonitsch, Kansas City, Mo., for Mark & Marsha Belton.

Don L. Slyter, Speers & Slyter, Kansas City, Mo., for Cheri Brown.

Fred W. Bryant, Rubins, Kase, Rubins & Cambiano, Kansas City, Mo., for Wood Realtors, Inc.

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT TO THE EFFECT THAT THE TRUSTEE CANNOT RECOVER THE SUM OF CERTAIN EARNEST MONEY DEPOSITS MADE BY THE DEFENDANTS TONEY WAYNE BROWN AND CHERI RENEE BROWN**

DENNIS J. STEWART, Chief Judge.

This is an action brought by the plaintiff trustee in bankruptcy to recover earnest money deposits in the sum of $2,000.00 on account of two contracts to purchase certain real property from the debtors, Mark and Marsha Belton ("debtors").[1] The plaintiff, as the successor in interest to the debtors, contends that the defendants To-

---

**1.** On August 1, 1985, the defendants Toney Wayne Brown and Cheri Renee Brown executed two contracts; one for the purchase of a tract of real estate at 11300 Military Club Road ("resi-

ney Wayne Brown ("Toney") and Cheri Renee Brown ("Cheri") breached these contracts for purchase by not closing the sales on or before October 1, 1985, and that, therefore, under the terms of the contracts, the amounts of the earnest money deposits must be forfeited, partially to her, as the debtors' successor in interest, and partially to the defendant Lou M. Wood Realtors.[2] Cheri denies liability, contending that it was an express condition precedent to her and Toney's [3] duty to close under the contracts that she and Toney obtain financing in the amount of $240,000 for the residence and secure an SBA loan for the boarding home; that they were unable to obtain financing on the residence until after the October 1, 1985, closing date and were never able to secure an SBA loan for the boarding home; and that, therefore, their duty to close the contracts never came into effect and they accordingly did not breach the contracts. Defendant Lou M. Woods Realtor contends that it is entitled to $1,000 of the total sum of $2,000 in earnest money deposits because the listing agreement with the debtors calls for one half of any deposit to be returned by the realtor in the event that a sale is forfeited by the buyers.

The issues which were thereby joined came on before the court for hearing of their merits on March 29, 1988, in Kansas City, Missouri, whereupon the plaintiff trustee in bankruptcy, appeared personally and as her own counsel; the defendant Cheri Renee Brown appeared personally and by Don Slyter, Esquire, her counsel; and the defendant Lou M. Wood Realtor appeared by counsel, Frederick W. Bryant, Esquire.[4] The evidence which was then adduced demonstrated that the debtors and Toney and Cheri entered into the contracts for the latters' purchase of the residence and the boarding home, which contracts relevantly provided as follows:

"If the seller has complied with the contract, and the buyer fails to comply with the contract on their part has herein provided within five (5) days thereafter ... in the event the seller shall declare the contract inoperative, the money deposited ... shall be paid to seller ... (Except that) purchase is subject to ... buyer, at his expense, securing an SBA—Landmark Bank loan."

The evidence further shows that the defendants Toney and Cheri timely applied to a lending institution, World Savings and Loan Association, for financing in the abovementioned amount of $240,000.00 and to Landmark Bank for an SBA loan. There is no suggestion in the evidence or otherwise that the defendants Toney Wayne Brown and Cheri Renee Brown were in any way dilatory or improvident in making their loan applications. Nevertheless, Landmark Bank rejected their application and the loan from World Savings and Loan Association was not offered to them until November 6, 1985, over a month after the closing dated of October 1, 1985. Toney and Cheri continued to evince an interest in purchasing these tracts of real estate, but they intended to purchase them only if they were able to purchase both since they would need to operate the boarding home in order to make payments to the lending institutions. According to the credible evidence, all concerned knew of this necessity

---

dence") for the sum of $320,000, and the second for the purchase of an adjacent tract of real estate at 11228 Military Club Road ("boarding home") for the sum of $100,000. These two tracts originally had been listed for sale as one tract, with a total purchase price of $420,000, but that the large tract had been split into two tracts to enable the Browns to obtain separate consumer and commercial financing on the residence and the boarding home, respectively.

2. For the relevant provisions of the governing contract as they relate to the forfeiture of the earnest money deposit, see p. 1003 of the text of this memorandum, *infra*.

3. Toney Wayne Brown and Cheri Renee Brown have since had their marriage dissolved.

4. Defendant Toney Wayne Brown did not appear. The files and records reflect that an order for service by publication of notice upon Toney was entered on March 7, 1988, and that a notice upon order for service by publication was issued by the court clerk that same day. That notice indicated that Toney had 45 days from and after March 7, 1988, in which to file an answer or other pleading, which time had not expired by the date of this trial.

to purchase the two tracts of property in tandem or not at all.[5] Cheri testified without contradiction to a continuing effort to obtain an SBA loan, through at least two lending institutions, the last one rejecting the loan application in late November or early December.

■ On the basis of these facts, it must be concluded that Toney and Cheri did not breach their contracts to purchase the tracts of real property in question. Despite the exercise of due diligence, they were not able timely to obtain the financing which would have brought into existence their duty either to close on the contracts or else to forfeit their earnest money deposits. The authorities which are cited in the footnote support a conclusion that potential purchasers, under such circumstances, do not forfeit their earnest money deposits.[6]

The court recognizes that the plaintiff presented testimony to the effect that Toney and Cheri represented to the real estate agent that, with a "gift letter" from a relative, they would have the wherewithal to close on the residence [7] contract. But, the credible evidence which is described above shows that, in order to have that wherewithal, financing was necessary to enable them to pay the purchase price of both tracts of real property.

At the conclusion of the trial of this action, this court announced its intention to make recommended findings of fact and conclusions of law to the district court on the merits of this controversy as provided in § 157(c)(1), Title 28, United States Code. The court did so because this is an action which is plainly founded upon an alleged breach of contract and is therefore an action arising exclusively under state law within the meaning of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which cannot constitutionally be determined in a non-Article III court in the federal court system. *"Northern Pipeline* effectively held that certain private state law claims, when adjudicated within the federal system, must be decided by Article III courts." *Kalaris v. Donovan,* 697 F.2d 376, 386 (D.C.Cir.1983).

■ The court understands that the plaintiff expressed her displeasure with the court's intention in this regard to a member of the court's staff immediately after the hearing. It was apparently the trustee's contention that if none of the parties objected, the bankruptcy court was vested with consent jurisdiction. But, to date, the authorities have not clearly approved so-called "consent" jurisdiction except in those instances in which the affected parties affirmatively invoke bankruptcy court jurisdiction.[8] Otherwise, it remains the duty of

---

5. The defendant Cheri Renee Brown so testified. There was other testimony, namely that of the defendant Lou M. Wood, which tended to contradict that of the defendant Cheri Renee Brown in this regard. But this court, on the basis of the appearance and demeanor of the respective witnesses, finds the testimony of the defendant Cheri Renee Brown to be credible.

6. See *Century 21 Al Burack Realtors v. Zigler,* 628 S.W.2d 915, 916 (Mo.App.1982) ("[S]uch a [financing contingency] provision is a condition subsequent to the existence of the contract, [authorities omitted] which, upon the non-occurrence of the stipulated event, may be raised to avoid the contract and ... to also ground the purchasers' own claim to the earnest money deposit.") and Cf. *Errante v. Kadean Real Estate Service, Inc.,* 664 S.W.2d 27, 29 [1] (Mo.App. 1984) ("Absent a satisfaction of this condition [subsequent] on or by the contingency date the contract is no longer operative ... the contract terminated and respondents became entitled to the return of the $2,000 they had paid appellants as earnest money.").

7. This was the testimony of the realtor, Lou M. Wood.

8. See *In Re Men's Sportswear, Inc.,* 834 F.2d 1134, 1137–38 [1] (2nd Cir.1987), where the Second Circuit held that a party's, "failure to object to ... assumption of 'core jurisdiction' at any point in these extensive proceedings before the bankruptcy court and the further failure to object to any part of the appeal process in the district court constitutes consent to final adjudication of this controversy before the bankruptcy court." See also the cases cited therein. This decision, however, appears to ignore the letter of § 157(b)(3), Title 28, United States Code. After finding evidence of express waiver of right to adjudication before an Article III court, the Supreme Court went on to add that a party's, "election to forgo his right to proceed in state or federal court on his claim and his decision to seek relief instead in a CFIC reparations proceeding constituted an *effective* waiver." (Emphasis added). *Commodity Futures Trading Com'n v. Schor,* 478 U.S. 833, 106 S.Ct. 3245,

the bankruptcy court to raise the jurisdictional issue on its own initiative even if none of the parties objects to bankruptcy court jurisdiction. See § 157(b)(3), Title 28, United States Code:

"The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."

This court, however, has previously held that it is appropriate to exercise bankruptcy court jurisdiction to deny relief against parties who have not affirmatively consented to bankruptcy court jurisdiction.[9] Thus, in the action at bar, if the adjudication is restricted to denying the trustee's request for relief, it will constitute, in effect, a declination to exercise jurisdiction with respect to any potential controversy between Lou M. Wood Realtors and Toney and Cheri over any portion of the earnest money which may be contended to be forfeitable to Lou M. Wood Realtors. That potential controversy—even if there were affirmative consent—could not qualify for bankruptcy court jurisdiction even as a "non-core" or "related" controversy. For it is simply a controversy between strangers to the bankruptcy estate over property which cannot be property of the estate and the result of which controversy can have no effect on bankruptcy estate administration. The authorities clearly hold that even affirmative consent cannot confer jurisdiction on the bankruptcy court to adjudicate such controversies.[10]

---

3257, 92 L.Ed.2d 675, 691 (1986). The court further added that the party, "had the option of having the common law counterclaim against him adjudicated in a federal Article III court, but with full knowledge that the [agency] would exercise jurisdiction over that claim, chose to avail himself of the quicker and less expensive procedure Congress had provided him. In such circumstances, it is clear that [the party] *effectively agreed* to an adjudication by the [agency] of the entire controversy by seeking relief in this alternative form." (Emphasis added). *Id.,* 478 U.S. at 849, 106 S.Ct. at 3257, 92 L.Ed.2d at 692.

**9.** In such an instance, no relief is granted to any party nor against any party except that one which invokes bankruptcy court jurisdiction. Thus, no party is deprived of any procedural right and no jurisdictional limitation is violated. See, e.g., *Matter of Dowell,* 82 B.R. 998, 1008 (Bkrtcy.W.D.Mo.1987), ("[T]he denial of the complaint ... may be looked upon either as a declination of jurisdiction or as a determination of the merits contrary to the plaintiff ...").

**10.** See, e.g., *Matter of Titan Energy, Inc.,* 57 B.R. 498 (Bkrtcy.W.D.Mo.1986), to the following effect:

"The provisions for consent jurisdiction in the bankruptcy court are now undone by the provisions of section 157(b)(3), *supra.* Otherwise, if bankruptcy court jurisdiction could so easily be founded upon relationship of a contractual right to the bankruptcy estate, the bankruptcy court would have had jurisdiction in the case of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., supra,* itself. Only during the halcyon days of broadened bankruptcy court jurisdiction under the Bankrupt-

cy Reform Act of 1978, before its invalidation by the Supreme Court in the *Marathon* decision, *supra,* did the bankruptcy court's jurisdiction extend so far. The decisions which are relied upon by the plaintiff to establish the jurisdiction of this court over the bellwether count of the complaint are all from the epoch of time in which section 1471(b) and (c), Title 28, United States Code, still governed the issue of bankruptcy court jurisdiction.

"Even if the first count of the complaint were within bankruptcy court jurisdiction (and, for the foregoing reasons, it is not), it would be taken out of bankruptcy court jurisdiction by its inextricable relationship to the suits between strangers to the estate. In its brief in support of jurisdiction in this action, the plaintiff asserts that, as to the nondebtor defendants, '[b]ecause ... [they] have asserted claims which may be within the scope of coverage were the policies found in effect, they are necessary and indispensable parties to the resolution of the existence of the policies themselves.' Claims between strangers to the bankruptcy estate which relate to matters outside the bankruptcy court jurisdiction cannot be entertained by the bankruptcy court. See, e.g., *In re Systems Marketing Consolidated, Ltd.,* 19 B.R. 519, 8 B.C.D. 1335, 1336 (Bkrtcy.N.D.Ill.1982), holding that the bankruptcy court does not have jurisdiction of a claim between two strangers to the estate if that claim does not 'arise in' the bankruptcy proceedings. This was generally the rule employed even during the effective dates of sections 1471(b) and (c)., *supra.*"

See also 2 Collier on Bankruptcy ¶ 23.08, p. 534, n. 7 (14th ed. 1977), to the following effect:

This court believes that this method of handling this action is preferable for the additional reason that the determination of the controversy depends, in material part, upon credibility determinations,[11] the basis for which this court cannot sufficiently describe with precise findings insofar as they are based upon this court's observation of the appearance and demeanor of the relevant witnesses.[12] If this court errs in this procedural respect, then the error may easily be corrected by the district court's either treating this opinion, on appeal, as a report and recommendation,[13] or else conducting its own de novo hearing in which it may satisfactorily observe the appearance and demeanor of the witnesses and thereby determine their credibility.[14]

Therefore, for the foregoing reasons, it is hereby

ADJUDGED that the complaint of the plaintiff trustee in bankruptcy to recover certain earnest money deposits, in the total sum of $2,000.00 from the defendants To-ney Wayne Brown and Cheri Renee Brown be, and it is hereby, denied.

---

"Thus consent cannot operate to confer jurisdiction on the bankruptcy court as to a claim asserted by the proceedings over a matter in no way connected with the administration or distribution of the bankrupt estate."

11. As observed above, in notes 3 and 4, *supra,* the testimony of the defendant Cheri Renee Brown to the effect that all parties understood that the defendants Toney Wayne Brown and Cheri Renee Brown must purchase both properties or neither of them and that due diligence was utilized in attempting to obtain financing is critical to the result here reached.

12. See *Matter of Richardson,* 85 B.R. 1008 (Bkrtcy.W.D.Mo.1988), to the following effect: "[T]his action appears to demonstrate the inefficacy of the bankruptcy court's making recommended findings of fact when the material issue to be determined is that of credibility. In those cases, use of the report-and-recommendation process, without the district court's conducting a new hearing on the issue, appears not only to offend the litigants' rights to an Article III trier of fact, but also to take little or no account of the ineffable character of a credibility determination. It appears that, in most imaginable instances, the district court would have to conduct a *de novo* hearing prior to making the determination and that, in those instances, the bankruptcy court's meantime offering recommended findings of fact and conclusions of law will have only resulted in delay in rendering the final decision and a duplication of effort between the bankruptcy court and district court."

13. See, e.g., *Smith v. United States,* 68 B.R. 105, 107, n. 3 (Bkrtcy.W.D.Mo.1986) ("Any question of whether the assignment of such power to the bankruptcy court converts it into an Article III court under the rule of *Glidden Co. v. Zdanok,* 368 U.S. 814, 82 S.Ct. 56, 7 L.Ed.2d 22 (1961), can be obviated in this action by the district court's treating the decision of the bankruptcy court as recommended findings of fact and conclusions of law and making its own decision on the basis thereof. See *In re Waters,* 93 F.2d 196, 198 (5th Cir.1937), to the following effect: 'We think that the referee went too far in attempting to decree a cancellation of the mortgage summarily; but, since the evidence was all reported stenographically and went up to the judge along with the documentary proof and was fully considered by the judge, who made his own decree, the case has just had the treatment it would have had if a plenary bill had been filed, been reported on by a master, and then considered by the court. The referee made full findings of fact and conclusions of law, as a master would do, and the appellant elaborately excepted to them as if to a master's report. We will treat the case as a controversy arising in bankruptcy by intervention and decided by the judge, review of which on appeal as in equity opens up questions of law and fact.' ").

